STEVENSON ARCHER, and others *vs.* STATE OF MARYLAND.

*State Treasurer—Qualification—Official bond—Mandatory provisions of the Constitution—Principal and Sureties—Estoppel.*

Section 5 of Article 6 of the Constitution, declares that "the Treasurer shall qualify within one month after his appointment by the Legislature." Article 1, section 6, provides that "Every

person elected or appointed to any office of profit or trust under this Constitution, or under the laws made pursuant thereto, shall, before he enters upon the duties of such office, take and subscribe the following oath." * * * * Section 7 declares that "Every person hereafter elected or appointed to office in this State, who shall refuse or neglect to take the oath of office provided for in the sixth section of this Article, shall be considered as having refused to accept the said office; and a new election or appointment shall be made as in case of refusal to accept or resignation of an office." Article 6, section 1, provides that the Treasurer "shall take such oath and enter into such bond for the faithful discharge of his duties as are now or may hereafter be prescribed by law." The statute law (sections 1 and 2 of Article 95 of the Code) provides for his taking an oath additional to that prescribed by the sixth section of the first Article of the Constitution, and then declares that before entering upon the discharge of his duties, he shall give bond to the State, with security or securities approved by the Governor, in the penalty of two hundred thousand dollars, and prescribes the condition of the bond. A. was appointed State Treasurer in January, 1886, and duly qualified as such on the 2nd of February, 1886. His term of office, as fixed by the Constitution, was to continue "for two years, and until his successor shall qualify." On the 13th of January, 1888, he was appointed by the Legislature his own successor; and on the 27th of the same month he executed a new bond with security, but failed and neglected to qualify further under that appointment until the 18th of November, 1889, on which day he took the prescribed oath of office before the Governor, and the latter approved said bond. The bond recited that he was duly appointed Treasurer on the 13th of January, 1888, pursuant to the provisions of the Constitution of the State, and of the laws thereof, and was conditioned for the faithful discharge of all the duties required of him by the Constitution and laws pertaining to his office. In an action by the State against A. and his securities upon this bond it was HELD:

1st. That no action could be maintained on said bond.

2nd. That the provisions of the Constitution in regard to the time within which the Treasurer shall qualify after his appointment, were mandatory and not merely directory, and related not to formalities but to essentials, which could not be overlooked and disregarded.

Archer, *et al. vs.* State.

3rd. That A's attempt to qualify in November, 1889, by then taking the constitutional oath of office under his appointment in January, 1888, was of no effect, as he had no right then to take the oath, and the Governor had no power to administer it to him.

4th. That the qualification in November, 1889, could not relate back to his appointment in January, 1888.

5th. That after the expiration of a month from his appointment in January, 1888, nothing but a new appointment, followed by a due qualification, could interrupt his holding the office under the first appointment and qualification in January, 1886; and he therefore held the office after November, 1889, just as he held it before that time, and continued so to hold it until his third appointment and due qualification thereunder, in January, 1890.

6th. That the approval of the bond by the Governor in November, 1889, was equally ineffectual to make it binding upon his sureties.

7th. That the contract entered into by the sureties as expressed in the bond, must be read in connection with the provisions of the Constitution to which it refers, and on its face being plainly a contract for the faithful discharge of his duties, provided he validly entered into office under the appointment of January 13th, 1888, in pursuance of the requirements of the Constitution, it would be doing violence to its terms if the contract could be read as making the sureties responsible for the discharge of any duties save those that became incumbent upon him by that appointment, and a due qualification thereunder.

8th. That as this bond was intended to be a statutory official bond, and nothing else, the sureties could not be held liable in this action upon the principle of estoppel and of voluntary bonds.

9th. That, as the bond bore date the 27th of January, 1888, and the evidence showed that the sureties had nothing to do with having it presented to the Governor for approval in November, 1889, at which time, according to the plain mandates of the Constitution, it was impossible for A. to qualify, there was no valid delivery of the bond to the State as the obligee.

10th. That as nothing was done on the faith of the approval of the bond, and the State's money and securities did not come into A's possession by reason of it, he being then in office *de jure* under his first appointment and qualification in January,

1886, and the State was protected by his first bond then given, which continued in force and was operative until the due qualification of his successor (that is himself,) under his third appointment in January, 1890, this was not a case in which the doctrine of estoppel or of voluntary bonds applied.

APPEAL from the Circuit Court for Baltimore County.

This suit was brought on the 26th of April, 1890, by the appellee against the appellants, upon an official bond dated the 27th of January, 1888, given to the appellee by Stevenson Archer, as Treasurer of the State of Maryland, as principal, and the other obligors as his sureties, and conditioned for the faithful performance of his duties as Treasurer under his re-appointment by the Legislature made on the 13th of January, 1888. The case is stated in the opinion of the Court.

The cause was argued before MILLER, ROBINSON, IRVING, BRYAN, McSHERRY, and BRISCOE, J.

*Edgar H. Gans, Albert Constable,* and *Bernard Carter,* for the appellants.

*John Prentiss Poe,* and *William Pinkney Whyte, Attorney-General,* for the appellee.

MILLER, J., delivered the opinion of the Court.

We have just decided in the preceding case that, under the clause of the Constitution which declares that the term of office of the Treasurer "shall be for two years and until his successor shall qualify," Archer's term of office, under his first appointment in January, 1886, commenced from the time of his due qualification under that appointment on the 2nd of February, 1886, and continued until the due qualification of his successor. He was appointed by the Legislature his own successor on the 13th of January, 1888, but failed and neglected

to take the oath of office, and failed and neglected to give an official bond, under that appointment, until the 18th of November, 1889. On that day he attempted to do both these things. He took the oath of office before the Governor, and the latter approved the bond, which was presented, and this is the bond which is sued on in the present case. The main question, presented by the rulings excepted to is, was the qualification on *that day* of any effect whatever, or in other words can any suit be maintained on this second bond? This depends in the first place, and mainly, upon the construction and effect of several clauses of the Constitution.

Article 6, sec. 5, declares that "the Treasurer *shall qualify* within *one month* after his appointment by the Legislature." Article 1, sec. 6, provides that "every person elected or appointed to any office of profit or trust under this Constitution, or under the laws made pursuant thereto, shall, before he enters upon the duties of such office, take and subscribe the following oath or affirmation." Then the oath is set out, and the following section (sec. 7) declares that "every person hereafter elected or appointed to office in this State, who shall refuse or neglect to take the oath or affirmation provided for in the sixth section of this Article, shall be considered as having refused to accept the said office, and a new election or appointment *shall be made* as in case of refusal to accept or resignation of an office." Taking this oath is what is meant by the terms "qualifying" and "qualification" as used in the Constitution. But in the case of the Treasurer, the Constitution provides that he shall also "take such oath and enter into such bond for the faithful discharge of his duties as are now or may hereafter be prescribed by law," (Art. 6, sec. 1,) and the statute law has provided that *in addition* to the oath prescribed by the sixth section of the first Article of the Constitution, he shall take an oath faith-

fully, diligently and honestly to discharge the duties of his office ; and then declares that before entering upon the discharge of his duties he shall give bond to the State, with security or securities approved by the Governor, in the penalty of $200,000, with condition that he will truly and faithfully discharge, execute, and perform all and singular the duties required, and which may be required of him by the Constitution and laws. Code, Art. 95, sections 1 and 2. In order, therefore, to induct a Treasurer into office and enable him to enter upon the discharge of his duties, he must, *first*, be appointed by the Legislature ; *second*, he must qualify within *one month* after his appointment, and take both the Constitutional and statutory oath; and, *third*, he must give the required bond.

It is with one only of these requirements that we are now particularly concerned. The plain *mandate* of the Constitution is that a person appointed by the Legislature to the office of Treasurer *shall qualify* by taking the constitutional oath of office *within one month* after his appointment, and with equal explicitness it is declared that if he refuses or neglects to do so *within that period of time*, such refusal or neglect shall operate as a refusal to accept the office, and a *new appointment* must be made as if he had by affirmative words declined or refused to accept it. We are unable to give these clauses of the Constitution any other interpretation. We cannot treat them as merely *directory* and not *mandatory*. Not only is the language of the Constitution too plain to admit of doubt, but the great weight of authority is against a *directory* construction of them. As said by Judge COOLEY : "Courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory *statutes* to the provisions of a *Constitution*. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules

Archer, *et al. vs.* State.

are looked upon as essential to the thing to be done ; and they must be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules by which all departments of government must at all times shape their conduct. * * * We are not, therefore, to expect to find in a Constitution provisions which the people in adopting it have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only ; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument when we infer that such directions are given for any other end ; especially, as has already been said, it is but fair to presume that the people in their Constitution have expressed themselves in careful and measured terms corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication.'' *Cooley Cons. Lim,* (*3rd Ed.*,) 78, 79. This is the view sustained by the decided weight of judicial authority throughout the country. The decisions in this State applicable to the subject and to the same effect are *Harwood vs. Marshall*, 9 *Md.*, 103, and *County Commissioners of Dorchester County vs. Meekins*, 50 *Md.*, 45. We cannot regard the case of *McPherson vs. Leonard*, 29 *Md.*, 377, as a controlling authority the other way. Two of the five Judges by whom that case was decided, dissented

and it has not been followed in any subsequent decision. Here the Constitution deals with the important office of State Treasurer. Its mandates are directed not to formalities, but to essentials, and, if they can be overlooked and disregarded, where can we find anything in the Constitution that is to be obeyed?

If, then, we are right in adopting this construction of these constitutional provisions, it follows that Archer's attempt to qualify in November, 1889, by then taking the constitutional oath of office under his appointment in January, 1888, was of no effect. He had no right then to take the oath, and the Governor had no authority to administer it to him. There is no power given to the Legislature, or to the Governor, or to any one else, to *condone* the failure to qualify within the prescribed time. The appointment did not of itself confer the office, and entitle him to assume its duties and responsibilities; qualification within the limited period was an essential prerequisite to that. *Thomas vs. Owens*, 4 *Md.*, 220. Nor could the qualification in November, 1889, relate back to his appointment in January, 1888, for that proposition is expressly repudiated in the case just cited, 4 *Md.*, 220. After the expiration of a month from his appointment in January, 1888, nothing but a new appointment, followed by a due qualification, could interrupt his holding the office under his first appointment and qualification, in January, 1886. He, therefore, held the office after November, 1889, just as he held it before that time, and continued so to hold it until his third appointment, and due qualification thereunder in January, 1890.

The approval of the bond by the Governor in November, 1889, was equally ineffectual to make it a binding obligation upon the sureties. It is familiar law that the contract of a surety upon an official bond is subject to the strictest interpretation. They undertake, in the language of Judge COOLEY, "for nothing which is not

within the strict letter of their contract. The obligation is *strictissimi juris;* and nothing is to be taken by construction against the obligors. They have consented to be bound to a certain extent only, and their liability must be found within the terms of that consent." *Mechem on Public Offices and Officers, sec.* 282 ; *United States vs. Boyd,* 15 *Pet.,* 187 ; *Gunther & Canfield vs. State, use of Bouldin,* 31 *Md.,* 29. This bond was executed by all the sureties, save one, on the 27th of January, 1888, before the expiration of a month from the date of his appointment, on the 13th. It recites that he was duly appointed Treasurer on the 13th of January, 1888, pursuant to the provisions of the Constitution of the State, and the laws thereof, and is conditioned for the faithful discharge of all the duties required of him by the Constitution and laws in all things pertaining to his office. This is the contract into which the sureties entered. It must be read in connection with the provisions of the Constitution to which it refers, and on its face is *plainly* a contract to be responsible for the faithful discharge of his duties, provided he validly entered into office *under the appointment of January 13th,* 1888, in pursuance of the requirements of the Constitution. It would be doing violence to its terms if the contract could be read as making the sureties responsible for the discharge of any duties save those that became incumbent upon him by that appointment, and a due qualification thereunder. Where the language of the contract is thus plain, it is scarcely necessary to cite authorities, but we refer to *Union Bank of Maryland vs. Ridgely,* 1 *H. & G.,* 324; *State vs. Wayman,* 2 *G. & J.,* 279; *Bruce, et al. vs. State, use of Love,* 11; *G. & J.,* 386; *United States vs. Le Baron,* 19 *How.,* 77, as abundantly sustaining the position. Entry, under the Constitution and laws, upon the office under that appointment, was an indispensable prerequisite to the coming into effect and operation of this

bond, and, as he never duly qualified under that appointment, this bond never became operative. Therefore the approval of it by the Governor in November, 1889, could not make it binding upon the sureties.

But it has been argued that, though it may not be good as a statutory bond, still, upon the principle of estoppel and of *voluntary* bonds, the sureties are liable in this action. We cannot, however, accept that doctrine as applicable to this case. We have already shown that this bond was *intended* to be a statutory official bond, and nothing else. But, apart from this, what is this doctrine of voluntary official bonds? The foundation on which rests the validity of what are known as voluntary official bonds is that, by virtue of the execution and lawful delivery of the bond, the principal has been *inducted into office,* and become possessed of the things appertaining thereto, and in such case it is held that, the surety having *by his act* enabled the principal to obtain the office, he is estopped to deny his liability for the official acts of the officer. *Mechem on Public Offices and Officers, sec.* 271; *Brandt on Suretyship, sec.* 445. But that is not the case here. This instrument on its face declares to all the world that it was given for securing the faithful discharge of his duties by Stevenson Archer, as a legally constituted Treasurer under his appointment of 13th of January, 1888, and we have shown he never became such. It is true that where a bond is executed by sureties, and delivered by them to their principal, they thereby clothe him with authority to deliver it for the purpose for which it was executed; but they give him no authority to deliver it for any other purpose than that which its terms show it was intended to serve. This bond bore date the 27th of January, 1888, and the record shows that the sureties had nothing to do with having it presented to the Governor for approval in November, 1889, when, according to the

Archer, *et al. vs.* State.

plain mandates of the Constitution, it was impossible for Archer to qualify. There was therefore no valid delivery of the bond to the State as the obligee. Again nothing was done on the faith of the approval of this bond, and nobody was injured or deceived by it. The State's money and securities did not come into Archer's possession by reason of this bond. He was then in office *de jure* under his first appointment and qualification in January, 1886, and the State was protected by his first bond then given. That first bond continued in force and was operative as long as the term of office under his first appointment and qualification continued, and we have said that this continued until the due qualification of his successor (that is himself) under his third appointment in January, 1890. This is not therefore a case in which the doctrine of estoppel, or of voluntary bonds, applies.

The case has been argued with great ability on both sides, and these are the conclusions we have reached, after giving it our best consideration. Several of the rulings excepted to are in conflict with these views, and we need not specify them in detail. For these errors the judgment will be reversed, and, as we have decided no action can be maintained on the bond, a new trial will not be granted.

*Judgment reversed, and
new trial refused.*

(Decided 17th June, 1891.)